May it please the Court, I am Bryce Kenney, on behalf of the appellant, Todd Asker. I think the most important issue for the Court on this appeal is to decide whether the touchstone of the Ford v. Hubbard decision was the fact that the petitioner there was proceeding without counsel. Now, in the most recently amended version of that opinion, the Court relies more heavily than ever on the Valerio v. Crawford en banc decision, which took pains to point out on remand that even though the petitioner there had counsel on appeal, obviously, and because it was a capital case, had counsel all the way through his federal collateral proceedings, that the district court must advise him that he had some unexhausted claims, and if the court declined to grant a stay, he ran the risk of, because of the statute of limitations under the AEDPA, losing those claims forever. What was odd about Valerio, though, was that there was no mixed petition until this Court got done with it. So, as far as I can tell from our cases, that situation was unique, and it would have been baffling, to say the least, to send it back to the district court in that shape without some instructions. But where in that case is a suggestion that there was a conscious decision to make that remand universal, rather than a specific response to the oddities of that case? Well, you know, the dissent in Ford argued vigorously that position, that it was a mistake to read that much into the Valerio v. Crawford decision. But that was the minority position, and it's true that... But both Ford and Kelly dealt with pro se petitioners. Yes, they did. And part of the rationale of those cases was the special rules and special help that are afforded to pro se petitioners, correct? There can be no doubt that that was part of the Court's rationale, but I don't think it was the entire rationale. And the very recent Brambles v. Duncan illustrates that, because that court cited Ford and Telema v. Long, plus two cases, non-habeas cases, where counsel was involved for the proposition that where a dismissal nominally without prejudice, actually because of the operation of a statute of limitations, will be with prejudice, it's erroneous not to stay the proceedings rather than dismiss. So there's a separate independent line of authority in this circuit. There are two separate issues there, though, aren't there? One has to do with whether a stay is required, even though allegedly it's discretionary. And the other is, what does the judge have to say to the petitioner about the petitioner's options? Aren't those two separate questions? Yes, they're separate but related, I think. And they would come up particularly when, on the face of the petition, it can be seen that absent equitable tolling or dismissal of unexhausted claims or a stay, claims are going to be lost forever because of the ADPA statute of limitations. But why is the court obligated to tell the lawyer in a represented situation what the consequences are going to be? Isn't that somewhat at odds with the general proposition that when people are represented by lawyers, they take it as they come? Yes, it is. But can it really fairly be said that it's fair to misrepresent even a lawyer, especially in 1997 when the ADPA was poorly understood by the courts and the bar? We've seen it evolve over these years. And in the recent decision of Smith v. Retell, the dissent, again, argued vigorously that how can we hold a judge to a standard in 1997 that wasn't even known at that time? But that illustrates that the ambiguities have to be given the benefit to the petition in that kind of situation where the law has evolved in an area. And we know now how it has to be applied. But in 1997, it was very uncertain. What about the extended delay in actually bringing it after the issue should have become clear? Well, that touches, I think, on our other argument for equitable tolling, and that is that the first habeas counsel had an undisclosed conflict of interest, which evidence would suggest might have been a substantial factor in him missing the deadline. That is that he wasn't truly advocating for his clients because he owed his clients sixty five thousand dollars, which he never intended to repay him. So the court can get to the result. We're looking for many, many paths here. The second important. It's not. Let's assume that's not a conflict. Then Judge Shader's question is even assuming in. I think it was nine months delayed between the state court proceedings and the federal courts. Nine months. Yes. If there's no conflict of interest, why should that period be told? Well, the other the other factual issues there were that were totally undeveloped in the district court. Where were the petitioner struggles with the prison system having to do with the disability of his arm? So they couldn't couldn't write his own petition, or at least it was a substantial amount of litigation. Did he say that disability didn't impair his ability to carry on other litigation? Did it? No. He he chose to focus that primarily his writing ability that he did have. Focus that on trying to get the adequate medical care that he needed for his arm, his plate, the pain relief, the physical therapy, the arm brace that would allow him to write. You know, it's true that I probably wouldn't have made that my priority. But on the other hand, he had counsel. And so, you know, should he have fired his attorney and taken over his petition pro se? Stillman v. Lamarck illustrates that there can be more than one proximate cause for any given result. And surely in sum total, all the factors here, it can't be fairly said that the prison's activities were not a substantial factor. His habeas attorneys conflict of interest. I think these were substantial factors. So even if there were other things at play, he could still be entitled to equitable tolling. Now, the other important point I want to make is that with respect to two claims, the trial court error as far as the inquiry made during trial and the actual conflict of interest claim made, those are controlled by the one year statute under 22, 44, D1D, which actually can restart the one year clock. Even, you know, regardless of what else is happening, he founded a new claim tomorrow that he had no reason to suspect the factual predicate of. He could file a new federal petition. And here, because in November of 1999, when he discovered the factual predicate of those claims through the declaration by trial counsel, state collateral proceedings were pending, which toll the entire time. So therefore, when those proceedings ran out, that started the one year clock under D1D. So under that scenario, those two claims would be timely. Well, clearly he was aware of the problem well before that. That last acknowledgment is not so. And why does that then entitle him to a new clock? Well, because he certainly had no reason to suspect that the trial judge himself believed that he was involved with the witness on the attack on his attorney. Until his attorney made that statement under oath that the trial judge believed he was involved all along. He had no reason to suspect that. As far as the actual conflict of interest claim under the rationale of Flanagan B. Johnson from the Fifth Circuit, which is cited many times in these types of cases. It's when he when he found when he got that declaration from counsel, it changed his claim, the character of his claim so that for the first time he had the ability to show that the conflict actually affected counsel's performance, which would entitle him to the chronic standard as Mickens v. Taylor made clear. So under the rationale of Flanagan, it did change the character of that claim. So they could could be said that he discovered the factual predicate for that claim at that time. In the on the issue of whether the forward rationale applies with his counsel. Do you know whether there are any other circuits which have decided that question? I'm not aware of any recent cases now, Your Honor, that have decided that question. This is. It's an open question. But, you know, again, I I can't I mean, an en banc decision from Valerio. I just can't imagine the court putting putting that specific instruction in there unless they were. Unless they had a good reason to do so. So at the very least here, there are factual issues undeveloped in the district court. Under Wayland, early V. Hunt, another en banc decision. The district court absolutely has to develop the factual record so that this court can decide whether equitable tolling or statutory tolling under D1B. Because of a state impediment that prevented the petitioner from filing should entitle him to relief. But I think on the two claims that I discussed earlier, it should be sent back for hearing on the merits because those claims were timely. Thank you. We'll give you a minute or two for rebuttal. Thank you. Please. This is the court. Ward Campbell, deputy attorney general for the respondent. A couple of basic truths here about this case. The statute, the statutory period for filing this petition, and when you include statutory tolling, ran out July 5th, 2000. They didn't file their petition until April 20th of 2001. To avoid that, they've invoked the factual predicate period of limitations, claiming that they were not aware of the, didn't have a factual predicate for their conflict of interest claim until the declaration from the attorney, the trial attorney in 1999. The fact of the matter is, of course, as has already been pointed out, the trial attorney who was stabbed by the defendant's witness at the time of trial had actually made statements as early as 1991, indicating his concern that Mr. Asher had been involved in the stabbing, and he had even sued Mr. Asher in 1991. And Mr. Asher was aware of that as early as December of 1991. So that factual predicate was long available. The additional declaration in November of 1999 didn't really add anything other than to that factual predicate that was already available. And, of course, the fact that that declaration hadn't been made did not prevent Mr. Asher from, in fact, making this claim over and over again in the appeals court and also the state habeas courts and even in the Northern District when he filed and made these claims prior to the availability of that declaration. As far as the knowledge about what the judge should have inquired about, obviously the record shows the judge did inquire about the conflict of interest, and it's a constructive thing. The judge did reasonably know there was a possible conflict there. He didn't need to have actual notice of what the judge may or may not have thought based on a hearsay declaration in November of 1999. That was apparent from the record of the original trial, that that claim was available. And, in fact, the Third District Court of Appeals and the state court discussed exactly that claim. So all those factual predicates are long available. That simply doesn't qualify to excuse the untimeliness of this petition. The Northern District filing. First, it's important to make clear that the Northern District order did two things. It did what it had to do. It dismissed the case because it was a mixed petition. It also specifically gave Mr. Asher, who was represented by counsel, counsel signed the petition. There's counsel's name on the petition, time to file an amended petition, which Mr. Asher and his attorneys simply never did in the Northern District. That was a short time frame, though, that was allowed, wasn't it? They were given approximately 41 to 45 days. And, of course, during this whole time, of course, it was a state habeas petition pending anyway in the California Supreme Court. How do you exhaust the previously unexhausted claims within that kind of time frame so you can file an amended petition? Well, the amended petition, of course, that the Northern District asked for was an amended petition that deleted the unexhausted claims. So you would have a petition in the Northern District that had exhausted claims. And then would there be a stay to permit the exhaustion? You could certainly have the option of asking for that stay, and Mr. Asher's counsel would have certainly had that option to seek a stay in that regard. And they simply never exercised or even tried any of those options. He never gave that as one of the options. He simply said you have a certain number of days to file an amended petition. The order from the Northern District doesn't speak one way or another to the option for a stay. It doesn't say there won't be a stay. It certainly did not preclude Mr. Asher, who was represented by counsel, the option of asking for that stay. I don't think any orders ever say you can't file a motion for a stay. Well, the point is the court's case law, which has discussed the admonitions that are to be given up until now, including what was written in the most recent Fort V. Hover, they make it clear that those admonitions are meant to be in the context of pro se petitioners. And that's a different issue than whether the judge advised them that one of the possibilities was a stay. Right. The point is the Northern District order didn't speak to that one way or another. Mr. Asher had counsel, and counsel certainly had the option of seeking a stay if he wanted to go ahead and avail himself of the option offered by the Northern District, an option which they did not even avail themselves, they did not even try to file an amended petition. They simply dropped the Northern District option. And under those circumstances, I don't see any grounds for equitable tolling. As far as the claim about the conflict of interest with counsel, what we're talking about here seems to be a fee dispute. This is nothing extraordinary about this. Anytime you retain an attorney, I suppose you're always going to have the argument that there may be an incentive for the attorney to not help the client in order so the client can't possibly sue him later on to get the fees back or get the loan back. That's not quite equivalent to borrowing $65,000. It's an unusual arrangement, but the fact is you could have also retained him with a certain amount of money as opposed to just done nothing, in which case, once again, there would be the argument that there was an incentive not to help. But actually, the fact is Mr. Frank or his associates, in fact, did continue to represent Mr. Asher in this case. They did file the petition in the Northern District. They, in fact, assisted in the filing of the petition in this case as well. So this idea that there's a conflict of interest based on the fee arrangement or the payment arrangement, once again, does not constitute an extraordinary circumstance. If you do, then you're going to have that possibility every time a petitioner is lucky enough to be able to retain counsel. The problem with Mr. Asher's disablement, which was prompted by the fistfight that he engaged in when he got shot years ago in Pelican Bay, he has, in fact, maintained an enormous amount of litigation. This court can look at its own docket to see the amount of litigation Mr. Asher maintains. And yet frequently during that time, he's declined the possibilities of amending claims to say that he's been denied access to courts or has been actually impeded in his ability to litigate. He, of course, has had counsel during this entire time. Counsel is even helping him now with these types of claims. The latest documents and some of the court filings that were brought to this court indicated that he was accommodated for a substantial period of time when he could have been preparing the effect of the petition that was ultimately filed in the Eastern District in this case and could have gotten it timely filed. In short, Mr. Asher creates a lot of problems for himself, and then he tries to blame everybody else for the problems. None of these things constitute an excuse for the nine-month delay in ultimately filing this petition. It's simply untimely, and the district court's judgment should be affirmed. Unless there's any questions, I would submit it. Thank you, counsel. Just briefly, Your Honors. First of all, the information that Asher had as far back as 1991 about, for example, when his former trial attorney sued him, all that evidence does not necessarily go to what his attorney's state of mind was when he was in the trial court, representing to the court that, yes, I have no problem representing this guy, there's not a conflict of interest here. It illustrates what he learned afterwards and could have or probably changed his point of view. When he provided the declaration in 1999, he stated unequivocally, I have always believed he was involved in the attack on me. So that's the first time that, under the Hasan V. Galazza standard, Asher would have an objective, good-faith basis for arguing that he was entitled to chronic reversal because of a complete and absolute conflict of interest that affected his counsel's performance. Counsel, objective by its very nature talks about what a reasonable person would have believed. And you're saying that he would not reasonably have believed back in 1991, at the same time that he was engaged in litigation with a lawyer on this issue, that he had that claim? Objective does not mean subjective. It means something else, doesn't it? True. And you're saying that he didn't know back in 1991 or that the reasonable person would not have known back in 91 about this issue? Well, viewed objectively, his attorney had one state of mind during the trial when he was arguing. Now, evidence came to light after that point, which, viewed objectively, would suggest that even if he believed there was no conflict of interest at the time of the trial, he came to believe that afterwards because of things that came to light for him. So I think from an objective standpoint, we're on firm ground. Next, although the trial judge did inquire into a conflict of interest during the trial, it was like the 9,000-pound elephant in the room that nobody wanted to look at, which is, hey, do you believe he was involved in it? You know, it was like a don't ask, don't tell kind of policy. All right, counsel, I think we've used up your excess time. OK, thank you. Thank you very much.
judges: Reinhardt, Graber,shadur